IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
NORFOLK DIVISION



FILED

NOV 22 2013

CLERK, U.S. DISTRICT COURT
NORFOLK, VA

EAGLE ON ALLIANCE, ET AL.,

Plaintiffs,

v.                    Civil Action No. 2:13cv371

JEWELL, ET AL.,

Defendants.

## OPINION AND ORDER

This matter is before the Court on Plaintiffs Eagle On Alliance and Carol F. Senechal's ("Plaintiffs") Motion for a Temporary Restraining Order ("TRO"), Doc. 15, and/or a Preliminary Injunction ("Motion").[1] Doc. 18. Plaintiffs seek to prevent Defendants, the Department of the Interior and the United States Fish and Wildlife Service from permitting, and the City of Norfolk and Wildlife Services (collectively "Defendants"),[2] from participating in, the removal of the nests of a pair of bald eagles that live at the Norfolk Botanical Garden in Norfolk, Virginia. The Court heard argument on this matter on the afternoon of October 29, 2013, and ruled from the bench.

After considering the instant Motion, Docs. 15, 18, and supporting memoranda, Docs. 22, 23; the Response in Opposition, Doc. 24; and oral argument, the Court **FOUND** that Plaintiffs are not entitled to a TRO or Preliminary Injunction against Defendants because they failed to

---

[1] For the sake of clarity, the Plaintiffs' Motion for a Temporary Restraining Order, Doc. 15, and their Motion for a Preliminary Injunction, Doc. 18, will be considered as one motion.

[2] Specifically, Plaintiffs named Sally Jewell, Secretary for the United States Fish and Wildlife Service; Dan Ashe, Director of the United States Fish and Wildlife Service; Wendi Weber, Regional Director of Director of the United States Fish and Wildlife Service, Division of Migratory Birds; Tom Visack, Secretary of the Department of Agriculture; and Kevin Shea, Administrator of Animal and Plant Health Inspection and Wildlife Services, as Defendants in this case.

meet the legal requirements set out by the Supreme Court in Winter v. Natural Resources Defense Council, Inc., 555 U.S. 7 (2008). Accordingly, the Court **DENIED** Plaintiffs' Motion for a Temporary Restraining Order and/or a Preliminary Injunction, and now issues this Order and Opinion detailing its decision.

## I. BACKGROUND[3]

This is an action under the Bald and Golden Eagle Protection Act ("Eagle Protection Act"), 16 U.S.C. §§ 668 et seq., the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 et seq., and the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, challenging the federal Fish and Wildlife Service's ("FWS") decision to grant the City of Norfolk ("City") a permit to remove the nests of a pair of bald eagles residing at the Norfolk Botanical Garden ("NBG" or "Gardens") in Norfolk, Virginia. Plaintiffs seek a declaratory judgment from this Court that Defendants have violated federal law by issuing a permit for the removal of the bald eagles' nests in NBG, and permanent injunction against future permits.

### A. Factual Background

The following set of facts is undisputed, unless stated otherwise. Eagle On Alliance ("EOA") is a group of 800 individuals from around the world who enjoy observing, studying, and photographing eagles—specifically those who reside in the Norfolk Botanical Garden. Doc. at 12 ¶¶ 4, 32–34. Plaintiff Senechal is a resident of Norfolk who founded EOA after spending many years watching, photographing, and enjoying the NGB eagles. Id. at ¶ 5.

Defendants are the Secretary of the Department of the Interior, the parent agency to the United States Fish and Wildlife Service ("FWS"), various high-level employees of FWS, and the

---

[3] The background and history set forth below are derived from evidence tendered in the TRO hearing, as well as pleadings and motions filed with this Court. These are preliminary factual findings based on the existing record which shall be used for the purpose of this motion only.

Secretary of the Department of Agriculture. Id. at ¶¶ 6–10. FWS is the principal federal agency responsible for conserving, protecting, and enhancing fish and wildlife, plants, and their habitats for the continuing benefit of the general population. Within its purview and in accordance with the Eagle Protection Act, 16 U.S.C. § 668, is the agency's right to issue permits for the "taking" or removal of bald eagles or their nests. Doc. 12 at ¶ 13. Permit holders may also be given the right to employ harassment techniques in order to prevent eagles from nesting in a given area.[4] Id. at ¶¶ 37–38.

The issuance of permits, however, requires a complex decisional process directed by both statutory and regulatory frameworks. See 16 U.S.C. § 668; 50 C.F.R. §22.23(c); §22.27(d)(6). Before a narrowly tailored permit may be granted, FWS implementing regulations mandate an agency investigation and subsequent finding that 1) the evidence shows "eagles have in fact become seriously injurious to wildlife" or other interests in the particular locality; 2) that "the injury complained of is substantial," or that the eagles "pose a significant risk to human or eagle health and safety;" 3) that "the only way to abate or prevent the damage caused by the . . . eagle is to take some or all of the offending birds;" and 4) that "[t]here is no practicable alternative to nest removal that would protect the interest to be served." Id.

In addition to the Eagle Protection Act and its own regulations, FWS must also comply with the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4331–4370, which imposes procedural obligations upon federal agencies to ensure careful compilation of relevant environmental information—usually in the form of environmental impact statements (EIS) or its

---

[4] "Harassment" includes removing partially constructed nests, shooting at the eagles with paintball guns, and shining bright lights upon them to prevent re-nesting. Doc. 12 at ¶¶ 37–38.

3

equivalent— and full exploration of less harmful alternatives before implementing proposed actions that would adversely affect the environment. §§ 4321 et seq.,4332(c);[5]

Complicating the matter is the fact that a portion of NBG is listed on the National Register of Historic Places, which Plaintiffs maintain, lends it protection under the National Historic Preservation Act (NHPA). 16 U.S.C. §§ 470, et seq. Under NHPA and the implementing regulations, an agency must consider any negative impact its actions may have on a registered historical site and provide the Advisory Council on Historical Preservation ("Advisory Council") with an opportunity to comment upon the undertaking. See 36 C.F.R. Part 800.

The genesis of the present matter began in 1938, when both NBG and Norfolk International Airport ("Airport" or "NIA") were built adjacent to each other and Lake Whitehurst, which provides a steady source of food for birds in the region. Id. at ¶ 33. Since 2003, a pair of eagles has nested, lived in, and raised their young in NBG. Id. at ¶¶ 32–34. According to Plaintiffs, these eagles (also referred to as the "NGB eagles") are also the only mated pair that resides in the Norfolk area, which can also be regularly viewed by the public. Id. at ¶ 36. In fact, in 2006 the Garden's administrators installed an "Eagle Cam" so that people around the world could view the NBG eagles' activities via the internet, as well as visit them in person. Id.

However, as it turns out, airplanes and eagles do not share territory well. Since 2002, there have been four collisions between bald eagles and airplanes at NIA—with two of the collisions involving eagles nested in close proximity to the Airport. The most recent incident

---

[5] Admittedly, this is an abridged discussion of the relevant statute and the related regulations; however, the details provided are sufficient for the Court's determination of the instant Motion.

4

occurred on April 26, 2011, when the female NBG eagle was killed by an airplane as she sat on the end of the runway.[6] Id.

In reaction, authorities at the Airport contacted appropriate state and federal agencies, including Defendants, and met with them to address the on-going safety risk, (to both the traveling public as well as the local eagle population), caused by the eagles nesting close to NIA. Doc. 24 at 5. The incidents also prompted the United States Department of Agriculture's Division of Wildlife Services ("WS") to publish a Wildlife Hazard Assessment for the Airport for August 2010- July 2011, which characterized the potential for recurring "eagle strikes" at NIA as posing an "extremely high" risk to aviation. Doc. 24 at 4–5. In addition, WS recommended that the eagles' nests at NBG be removed as a "hazard mitigation measure." Id. at 5. Further investigations were then conducted by various state and federal agencies, and several publicly and privately employed experts were consulted regarding the threat the eagles posed to the flying public as well as themselves.[7] Doc. 24 at 16–17.

In September 2012, FWS issued the City, (to be aided by WS), the permit that Plaintiffs now challenge. Doc. 12 at ¶ 37. Its substance granted the City the right to remove up to three inactive bald eagle nests by November 9, 2012, and to disturb the eagles living in NBG through harassment techniques in order to alleviate the "safety emergency" at the Airport. Id. at ¶ 38. On October 1, 2012, FWS amended the permit to authorize taking of active or inactive nests. Id. ¶ 30. Accordingly, the City implemented a program whereby it would remove both completed nests as well as partially completed nest, and maintain a steady harassment of the NBG eagles in an attempt to ensure they re-nested in a safer place away from the airport. To minimize the

---

[6] The male eagle has since re-mated and continues to nest in NBG with his new mate. Doc. 14, ¶¶ 35–36.
[7] NIA authorities consulted Sarah Nystrom, FWS' Regional Bald and Golden Eagle Coordinator; an eagle Biologist from the Center for Conservation at the College of William and Mary; and Dr. Scott C. Barras, a United States Department of Agriculture employee who also serves the Animal and Plant Health Inspection Service, Wildlife Services (as a Supervisory Wildlife Biologist); and the State Director for Virginia. See Doc. 24.

disruptive nature of their activities, WS has limited its harassment and dispersal measures at NBG to mostly after-public hours, and applies the least disturbing techniques first before taking other measures. Doc. 24 at 14.

Currently, the challenged permit has been in place for more than a year, though the City has applied for a new permit instead of relying upon the three-year statutory grace period that would allow it to continue its nest-removal plan. Id. Defendants stated on the record that they expect the FWS to issue its decision on a new permit in the near future. Id.

Since FWS issued the current permit, the City, acting through WS, has removed at least seven eagles' nests in NBG, Doc. 14 at ¶ 39, and has continued to maintain a level of harassment of the NBG eagles to prevent re-nesting, as the nesting and breeding season runs from late November through June. Doc. 24-1 at ¶¶ 15–21. Plaintiffs filed the instant Motion in reaction to these on-going actions taken against the NBG eagles. See Docs. 22, 23.

**B.  Procedural History**

On July 3, 2013, Plaintiffs filed a Complaint against Defendants Sally Jewell, Secretary for the United States Fish and Wildlife Service; Dan Ashe, Director of the United States Fish and Wildlife Service; Wendi Weber, Regional Director of the United States Fish and Wildlife Service, Division of Migratory Birds; Tom Visack, Secretary of the Department of Agriculture; and Kevin Shea, Administrator of Animal and Plant Health Inspection and Wildlife Services. Doc. 1. On September 5, 2013, a Consent Motion was filed, Doc. 8, and on October 9, was granted, Doc. 9, extending the time for Defendants to file an answer until October 9, 2013. On October 2, 2013, Defendants filed their Answer. Doc. 10. On October 3, 2013, Plaintiffs filed an Amended Complaint against all Defendants, clarifying their prior claims, Doc. 12, and on October 21, 2013, Defendants filed their Answer to the Amended Complaint. Doc. 14.

On October 25, 2013, Plaintiffs filed the instant Motion for a Temporary Restraining Order, Doc. 15, and/or a Preliminary Injunction, Doc. 18, and filed Amended Memoranda in Support, Docs. 22, 23, on October 28, 2013. The Defendants also responded in opposition on October 28, 2013. Doc. 24.

## II. STANDARD OF REVIEW

Preliminary relief—whether through a temporary restraining order or a preliminary injunction—is an extraordinary remedy "involving the exercise of very far-reaching power to be granted only sparingly" and to be applied only in limited circumstances. MicroStrategy Inc. v. Motorola, Inc., 245 F.3d 335, 339 (4th Cir. 2001); see, e.g., Winter, 555 U.S. at 24. A prohibitory preliminary injunction "protect[s] the status quo . . . to prevent irreparable harm during the pendency of a lawsuit [and] ultimately to preserve the court's ability to render a meaningful judgment on the merits." In re Microsoft Corp. Antitrust Litig., 333 F.3d 517, 525 (4th Cir. 2003), abrogated on other grounds by eBay, Inc. v. MercExchange, LLC, 547 U.S. 388 (2006).

To obtain a TRO or Preliminary Injunction,[8] Plaintiffs bear the burden of establishing that (1) they are likely to succeed on the merits, (2) they are likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in Plaintiffs' favor, and (4) an injunction is in the public interest. WV Ass'n of Club Owners & Fraternal Servs v. Musgrave, 553 F.3d 292, 298 (4th Cir. 2009) (citing Winter, 555 U.S. at 20). As the Fourth Circuit noted, the previous "balance-of-hardship test" for preliminary relief "may no longer be applied in granting or denying preliminary injunctions in the Fourth Circuit," because that test was "in fatal tension" with Winter. Real Truth About Obama v. FEC, 575 F.3d 342, 346 (4th Cir. 2009),

---

[8] "The standard for granting either a TRO or a preliminary injunction is the same." Moore v. Kemthorne, 464 F. Supp. 2d 519, 525 (E.D. Va. 2006).

7

reissued on remand, 607 F.3d 355, 355 (4th Cir. 2010) (per curiam). Thus, a plaintiff in the Fourth Circuit can no longer obtain preliminary relief based solely on the presentation of a "grave or serious question for litigation," or a mere "possibility" of irreparable harm. Rather, "all four requirements must be satisfied," including a showing of "likelihood of success" on the merits and a "likelihood of irreparable harm." Id. at 346.

### III.    ANALYSIS

Plaintiffs filed for a TRO and/or a Preliminary Injunction to enjoin the Defendants from acting in accordance with their rights under the FSW permit, and removing more of the NBG bald eagles' nests. Docs. 15, 18. In support of the instant Motion, Plaintiffs allege the following: 1) that they are likely to succeed on the merits by showing that Defendants did not follow the applicable statutory and regulatory requirements before issuing the challenged permit; 2) that Plaintiffs will suffer irreparable harm in losing their ability to esthetically enjoy, study, photograph, and view the NBG eagles if Defendants do not end their nest removal and harassment program; 3) that the balance of equities weighs in Plaintiffs' favor; and 4) that the public interest warrants protecting the NBG eagles from further harm allowed under the current permit. Doc. 24. This Court addressed each element in turn to determine whether a TRO and/or a Preliminary Injunction should be issued in this case, and now further explains its holdings.

#### A.    Likelihood of Success on the Merits

A plaintiff must make a clear showing that it will likely succeed on the merits at trial before a court can issue a preliminary injunction in its favor. Winter, 555 U.S. at 20; Real Truth About Obama, 575 F.3d at 346–47. Even at the preliminary injunction stage, administrative decisions are presumed to be valid as a court must review plaintiffs' claims under the Administrative Procedure Act ("APA"). 5 U.S.C. § 706(2). The APA provides that the

reviewing court "shall . . . set aside" an agency's decision *only* if it is "arbitrary and capricious," an "abuse of discretion," or "otherwise not in accordance with law" or the procedures required by the law. § 706(2)(A),(D); see also American Wildlands v. Kempthorne, 478 F. Supp. 2d 92, 96 (D.D.C. 2007), aff'd 530 F.3d 991 (D.C. Cir. 2008) ("Under the APA's standard of review, there is a presumption of validity of agency action."). In addition, the court "must consider whether the decision was based on a consideration of the relevant factors." Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 30–31 (1983). While the agency's treatment of the evidence need not be a "paragon of clarity," the reviewing court needs to be able to discern a "rational basis" for the agency's treatment of the evidence. Bowman Transp., Inc. v. Arkansas- Best Freight Sys., 419 U.S. 281, 289–90 (1974). Finally, reviewing courts are to be at their most deferential where the action under review "requires a high level of technical expertise." Marsh v. Oregon Natural Res. Council, 490 U.S. 360, 377 (1989) (citation omitted); accord Baltimore Gas & Elec. Co. v. NRDC, 462 U.S. 87, 93, 96, 103, 105–106 (1983).

In this case, Plaintiffs assert that they are likely to succeed on the merits of each of their three claims arising under the Eagle Protection Act, the National Environmental Policy Act, the National Historic Preservation Act, and each of the previously listed statutes' implementing regulations. The Court disagrees for the following reasons.

  i. *The Eagle Protection Act*

Plaintiffs aver that FWS unlawfully issued the City a permit to "take" bald eagles nests because the agency 1) failed to make the requisite finding that such measures were "necessary to alleviate an immediate threat to human or eagle safety," 50 C.F.R. § 22.27(b); 2) violated its obligation to ensure there were no practicable alternatives to nest removal that would serve the

9

stated interests, § 22.27(e)(4); and 3) failed to consider the cultural significance of the NBG eagles. § 22.27(d)(6).

Plaintiffs support their first argument by referring to biologists and other experts' reports and warnings that the City's planned harassment and nest removal techniques may be ineffective in deterring either the NBG eagles or future eagles who would come and replace the current resident eagles—(if the present NBG eagles were driven out)—from nesting in NGB and the surrounding areas because of the favorable habitat the Gardens present. Doc. 22 at 15–16; Doc. 12 at ¶¶ 42–43. Plaintiffs cite internal meeting minutes from William and Mary's Center for Conservation and Biology members' discussion about the Airport's dilemma as proof that FWS knew the removal plan would be unsuccessful. Doc. 12 at ¶ 43. In the meeting, an eagle biologist stated that "eagles will forage in the Lake Whitehurst area regardless of whether they are related to the NBG nest," and that it is questionable "whether harassment efforts could be sustained at a level that would keep the eagles from rebuilding in this vicinity." Id. Plaintiffs conclude that Defendants' decision to proceed with a plan that had only limited expert support and would, in the best case scenario, be only partly efficacious, was irrational and unnecessary and therefore violative of the Eagle Protection Act. Doc. 22 at 16.

The Court finds, however, that Plaintiffs have failed to show that FWS's decision to issue the permit was contrary to the law, arbitrary, or that the agency did not follow the procedures required by the law. Indeed, prior to issuing the permit, FWS was aware that since 2002 four eagles had been killed when they collided with planes at the Airport, and that WS had already deemed the risk of further "eagle strikes" to be "extremely high." Doc. 24 at 4–5. Additionally, FSW met with all of the stakeholders in the summer preceding the permit's issuance and received the Federal Aviation Administration ("FAA"), WS, and the Virginia Department of

Game and Inland Fisheries' approval of the nest removal program. Id. at 5. In fact, the FAA, which has regulatory authority over bird strike issues and aviation safety, even made the initial recommendation to the City that it apply for the needed permit so that City officials could work with NIA and adjoining landowners "to prevent eagles from nesting in the vicinity of the airport." Id. at 16.

The fact that various experts disagreed about the efficiency of the removal/hazing plan does not mean it was unnecessary or that FWS failed to make the requisite finding. Plaintiffs own exhibits demonstrate that while there was no consensus among experts about how to alleviate the eagle threat, the NBG nest was stated as "a contributing factor" of the potential harm. Doc. 22, Pl. Ex. F at 2. When facing a choice between doing nothing about the hazard the eagles posed to themselves and the Airport's patrons, and committing to a course of action that had, even assuming, *arguendo*, a narrow chance of success, it becomes even more clear that FWS acted rationally in issuing the permit. Therefore, the Plaintiffs have not presented sufficient evidence that FWS acted unlawfully in determining nest removal was "necessary," and issuing a permit to effectuate their decision.

Next, Plaintiffs contend that FWS failed to explore non-nest removal options, as required by the Eagle Protection Act. Doc. 12 at ¶ 46. Plaintiffs claim that the Airport's lack of a full-time wildlife expert on staff and its unwillingness to substantially increase its annual budget for "eagle surveillance and harassment" activities, as proposed by Wildlife Services in the wake of the 2011 NBG eagle/airplane collision, shows that Defendants did not pursue all practicable alternatives as required by statute. Doc. 22 at 19. Plaintiffs refer to Virginia Department of Game and Inland Fisheries' suggestion to Airport officials that "more patrol/dispersal efforts" at

NIA might be a "more effective" way to detect and deter unwanted birds as evidence of alternate options Defendants were required to pursue. Id. at 18, Pl. Ex. O.

However, there are several problems with this course of argument. First, Plaintiffs have not sued the Airport; therefore, they cannot blame Defendants for the Airport's refusal to increase its wildlife deterrence budget. See Email Exchange between Steve Sterling and Wildlife Services between February 1, 2012 and April 18, 2012, Pl. Ex. W (the Airport insists that their wildlife management budget had to be reduced from $70,000 to approximately $40,000 given fiscal constraints). Second, the evidence shows that Defendants, along with officials at NIA, contemplated four basic control strategies available for minimizing wildlife problems at the Airport before FWS issued the permit; they included: "1) Aircraft flight schedule modification; 2) Habitat modification and exclusion; 3) Repellent and harassment techniques; and 4) Wildlife removal." Doc. 24-1 at 18–19. As described above, Defendants considered nest removal necessary in light of their stated objective to lessen the risk posed to the traveling public. Hence, it is clear Defendants pursued other courses of action before turning to nest removal as the chief method to protect their interest; as such, Plaintiffs have failed to meet their burden of persuasion on this point.

Plaintiffs' last argument under the Eagle Protection Act is that Defendants did not consider the "cultural significance of [the] local eagle population," as an additional statutory requirement. Doc. 22 at 20. Before the City's implementation of the removal plan, Plaintiffs note that the NBGs gift shop was "full of eagle memorabilia," and that millions of people enjoyed the Garden's "Eagle Cam" that allowed viewers to watch eagles around the clock via the internet. Doc. 22 at 5–7. The NBG eagles are especially important to Norfolk, Plaintiffs claim, because they are the only mated pair readily available for public viewing. Doc. 12 at ¶ 36.

In their Response, Defendants countered and the Court agrees, that Plaintiffs narrowly construed the meaning of "local eagle population" to just the NBG eagles. Doc. 24 at 19. But contrary EOA's interpretation, and in accordance with a correct statutory reading, FSW considered the putative permit's impact in light of the entire local eagle population. First, in considering the significance of the local eagle population, Defendants note that since 1970, which marked the low point of the national eagle population, eagles have made a dramatic recovery, especially in Virginia. Id. at 4. The bald eagle population in the Chesapeake Bay Region, specifically along the James River, consists of 205 pairs that produced 267 young in 2013. Id. Furthermore, in evaluating the impact of the removal of the NBG eagles upon Virginians, FWS found that there are several eagles' nests located in and around the Norfolk area that are accessible to the viewing public. See Doc 22, Pl. Ex. F at 1 (noting 18 eagles' nests within a short driving distance from Norfolk at numerous National Wildlife Refuges). Given these facts, Plaintiffs again failed to meet their burden and their argument fails for the reasons stated.

    *ii.    The National Environmental Policy Act*

Plaintiffs argue Defendants violated NEPA by failing to substantiate their finding that the proposed eagle removal plan would have "No Significant Impact" on the environment with the requisite Environmental Assessment ("EA"). Doc. 22 at 20–21. Generally, an Environmental Impact Statement is required by federal agencies contemplating actions that may "significantly affect[] the quality of the human environment"; 42 U.S.C. § 4332c, however, an agency may prepare an EA to determine if an ESI is even required. 40 C.F.R. § 1501.4(b). If the agency concludes there will not be any significant environmental impact, it may issue a finding of No Significant Impact, and the EIS is not required. See 40 C.F.R. §§ 1501.3, 1501.4(c), (e), 1508.9.

13

In light of both the public outcry over the issued permit and the evidence showing that some consulting wildlife biologists were of the opinion that removal of the NBG eagles' nests would not prevent a future eagle strike at the Airport, Plaintiffs maintain that the FSW decision not to conduct an EA is plainly contrary to NEPA requirements. Doc. 22 at 31. They also contend that the FWS's failure to prepare the EA shows that the agency did not "[r]igorously explore and objectively evaluate all reasonable alternatives" to their actions, another NEPA requirement. 40 C.F.R. § 1502.14(a). EOA states that "at an absolute minimum, an EA should have been prepared to analyze the[] various factors." Doc. 22 at 23.

Under the APA, the Court is required to give agency decisions "substantial deference." 5 U.S.C. § 706(2)(A); Friends of Boundary Waters Wilderness v. Bosworth, 437 F.3d 815, 821–22 (8th Cir. 2006). In issuing the challenged permit, FWS conducted a review under NEPA and determined that the activity would cause minor or negligible effects on the human environment and therefore neither an EA nor further NEPA review was required. This decision required a technical analysis, which this Court is ill equipped to review. Considering the deference given to such agency decisions, it is clear that the Plaintiffs have not provided enough evidence to convince the Court that FWS's decision was "arbitrary and capricious"; thus, Plaintiffs argument on this ground also fails.

*iii.* *The National Historic Preservation Act*

As a place listed on the National Register of Historic Places, Plaintiffs contend Defendants FWS and WS violated NHPA by failing to "take into account the effect" of their actions on NBG and its' visitors. 16 U.S.C. § 470f; Doc. 22 at 25. Specifically, Plaintiffs argue that as a historical site, the Gardens should be a peaceful and welcoming place that will attract tourists. The removal of the NBG eagles has not only lessened the Garden's appeal, but the

harassment techniques employed by WS, have "diminish[ed] the integrity of the property's ... setting ... [and] feeling." 36 C.F.R. § 800.5(a)(1).

Defendants countered, and submit that Plaintiffs mistakenly state that the NBG is listed on the National Register of Historic Places. Doc. 12 at ¶ 1. According to Defendants, only a portion of the NBG, a 30-acre section known as the "Azalea Garden," is listed on the National Register—an area more than 800 feet south of where any eagles nests were found and removed. Doc. 24 at 21–22. Therefore, Defendants conclude they are not required to comply with NHPA as no historic properties will be affected by activities under the permit. Nevertheless, Defendants point out that they minimize the disruptive nature of their activities by applying measures on a case-by-case basis, concentrating the most disturbing techniques in the early-morning and late evening. Doc. 24 at 14.

Plaintiffs' may only prevail under NHPA if the challenged permit and Defendants' activities affect a historically registered site. As neither party submitted evidence supporting their arguments, the Court will withhold a finding on this matter, though FWS and WS's actions are presumed correct under the APA. See 5 U.S.C. § 706(2).

*iv. Conclusion*

In summation, the Court does not find that Plaintiffs have met their burden by demonstrating Defendants failed to meet with the statutory and regulatory requirements that informed and restricted their decision making process in issuing the challenged permit or implementing it; thus, it is not clear to the Court that Plaintiffs would be likely to succeed on the merits of their claims at trial.

**B.     Irreparable Harm**

The Supreme Court of the United States has indicated that plaintiffs seeking preliminary relief must demonstrate that irreparable harm is likely in the absence of the requested relief. Winter, 555 U.S. at 20 (indicating that a movant for preliminary injunction must demonstrate more than a possibility of irreparable harm). Plaintiffs assert they will suffer irreparable harm on two grounds: 1) NBG eagles have already suffered irreparable harm because of Defendants' actions because they have been prevented from building a nest and raising a family for an entire nesting season and will continue to suffer; and 2) EOA members and individuals around the world have been and will continue to be deprived of their ability to watch the eagles nest and raise their young. Doc. 22 at 26–27.

Plaintiffs' first argument fails as the harm they cite—that the NBG eagles' inability to nest in the Garden—has almost entirely occurred in the past. Plaintiffs may not justify emergency injunctive relief by relying solely on allegations of wholly past harm. See National Min. Ass'n v. Jackson, 768 F. Supp. 2d 34, 48 (D.D.C. 2011) ("'An injunction is designed to deter future wrongful acts,' United States v. W.T. Grant Co., 345 U.S. 629, 633(1953), and thus, while past harm is relevant, the ultimate inquiry remains 'whether there is a real and immediate threat of repeated injury.' D.C. Common Cause v. District of Columbia, 858 F.2d 1, 8–9 (D.C. Cir. 1988).").

Moreover, this argument is inconsistent with Plaintiffs' line of argument under the Eagle Protection Act that Defendants' efforts in trying to prevent the NBG eagles from re-nesting in the Gardens are, and will continue to be ineffective. See Doc. 22 at 15–16; Doc. 12 at ¶¶ 42–43. If, as Plaintiffs maintain, Defendants' efforts will not deter the NBG eagles from residing in and raising their young in the Gardens, then Plaintiffs cannot possibly suffer "irreparable harm"

because, according to them, the eagles "will likely rebuild in future nesting seasons."[9] Doc. 22 at 13.

Next, EOA's contention that their members will continue to suffer irreparable harm *if* they are deprived of watching the NBG eagles activities in the Gardens is inconsistent with the purpose of preliminary relief—to "maintain" the status quo until trial. See In re Microsoft Corp. Antitrust Litig., 333 F.3d at 525. Plaintiffs also undermined their own argument of "irreparable harm" due to the dilatory manner in which they pursued legal redress. The Court notes that it is unusual for a plaintiff who claims "irreparable harm" to delay in 1) filing a complaint so long after the alleged harm begins; and 2) waiting over three months before moving the court for preliminary relief. Though Plaintiffs explained on record that their delay in pursuing legal action was due to their belief they could come to an agreement with Defendants about the situation, their position and actions are incompatible with the spirit of "emergency relief." See National Min. Ass'n v. Jackson, 768 F. Supp. 2d at 48.

What is undisputed is that Plaintiffs waited over ten months after the harm they claim is "irreparable" began—(when the initial permit for the nest removal was issued and implementation began)—before filing suit, and they waited another three and a half months before filing for injunctive relief. Indeed, the challenged permit Plaintiffs complain of expired on October 31, 2013, and Defendants have already applied for a second permit. While Plaintiffs may have had legitimate reasons for delaying their pursuit of the requested relief, the Court finds that there is too little evidence to support a finding of irreparable harm in their favor.

---

[9] The Court notes and stated on the record; however, that both parties engaged in circumlocutions. Though Plaintiffs employed circuitous logic, Defendants too, employed the tactic by first arguing that the nest removal plan is necessary to alleviate the threat the NBG eagles pose to the airport, and then arguing that the Plaintiffs cannot suffer irreparable harm because the eagles will re-nest in the Gardens in the future.

**C.     Balance of Equities**

Plaintiffs must also establish that the "balance of equities tips in [their] favor." Winter, 555 U.S. at 20. However, the Court makes no findings on this element as the evidence is vague and conflicting.

**D.     Public Interest**

Finally, Plaintiffs must establish that preliminary relief would be in the public interest. Winter, 555 U.S. at 20. Plaintiffs assert that the public interest is served by having the NBG eagles remain in the Gardens because they are a source of enjoyment for the community and world at large, and the preservation of eagles serves an important state/governmental interest. Doc. 22 at 27.

Though it is undisputed that many tourists and visitors enjoyed watching the NBG eagles prior to when the nest removal plan went into effect, Plaintiffs have not made a compelling argument as to how their stated interest in enjoying the NBG eagles surpasses the general need for safety—both of the traveling public and the eagles themselves. Granted, while FWS's focus in issuing the challenged permit was on the safety of the traveling public, it is undisputed that four eagles have been killed in collisions with airplanes at NIA since 2002, and ensuring wildlife safety is also one of Defendants' priorities.

Indeed, Plaintiffs insist that "there is an extremely small risk that one of the NBG Eagles will be involved in another collision at the Norfolk Airport during the time it takes this Court to resolve this case on the merits." Doc. 19 at 33. However, even assuming, *arguendo*, that the risk of collision is small, which Defendants deny, the potential magnitude of the harm is great. Such a collision between an eagle and airplane could be lethal to passengers and the eagle involved. Doc. 24 at 16. After the 2012 eagle/airplane collision, the FAA sent a letter to the City

concurring with a previous USDA finding that the presence of nesting eagles near the Airport "presented a significant safety hazard to the flying public." Id. Given this evidence, the Court cannot overlook the possible harm that could occur and deny Defendants the right to pursue every permissible course of action to reduce the stated risks.

Next, Plaintiffs' argument that eagles are an important symbol for the United States and their preservation as a whole is important to society, (as demonstrated by the fact that Congress passed such legislation as the EPA), Doc. 22 at 29, is not in dispute. As Defendants note, the importance of the eagle population and its symbolic meaning to Americans is not the focal point of this dispute. Plaintiffs argument detracts from the main issue, which is that they fail to link the importance of the NBG eagles to the public in general, rather than their own specific members' interested in seeing the one mated pair of eagles who were residing in NBG. Plaintiffs' brief and oral argument neglected to adequately contemplate and address the other public interest at stake in this matter—the public's safety as well as the eagles' own safety.

As the foregoing analysis shows, the Court finds that there is no basis upon which it could justifiably enjoin Defendants' activities pending the outcome of its final review of the merits of this case—especially when doing so is credibly alleged to increase the threat of danger to the public and to the very birds the Plaintiffs seek to protect.

## IV. CONCLUSION

For the reasons stated above and on the record, Plaintiffs' Motion for a Temporary Restraining Order and/or a Preliminary Injunction is **DENIED** based upon the Court's **FINDING** that Plaintiffs did not meet their burden in showing a likelihood of success on the merits of their claims; that they did not show they were likely to suffer irreparable harm if their

request for preliminary relief was denied; and that the Court's granting of preliminary relief would be in the public's interest.

The Clerk is **REQUESTED** to mail a copy of this Order to all counsel of record.

It is so **ORDERED**.

/s/
Henry Coke Morgan, Jr.
Senior United States District Judge

HENRY COKE MORGAN, JR.
SENIOR UNITED STATES DISTRICT JUDGE

Norfolk, Virginia
November 22, 2013