**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**NORFOLK DIVISION**



FILED

SEP - 8 2014

CLERK, U.S. DISTRICT COURT
NORFOLK, VA

**EAGLE ON ALLIANCE, ET AL,**

      **Plaintiffs,**

        **v.**                        **Civil Action No. 2:13cv371**

**JEWELL, ET AL,**

      **Defendants.**

## OPINION AND ORDER

This matter is before the Court on Defendants Tom Vilsack and Kevin Shea's (collectively the "USDA Defendants") Motion to Dismiss, Doc. 41, and Defendant Norfolk Airport Authority's ("NAA") Motion to Dismiss the Second Amended Complaint. Doc. 35. The USDA Defendants seek dismissal under Rule 12(b)(1) on the grounds that Plaintiffs lack Article III standing. See Doc. 42. NAA asserts three grounds for dismissal including lack of standing, failure to state a claim, and failure to join a necessary party. See Doc. 36. The Court heard oral argument on July 8, 2014 and took the matters under advisement.

After considering the instant motions, supporting and opposing memoranda, as well as oral argument, the Court **DENIES** the USDA Defendants' Motion to Dismiss and **GRANTS** NAA's Motion to Dismiss the Second Amended Complaint for the following reasons.

## I.      BACKGROUND

This case centers on the United States Fish and Wildlife Service's ("FWS") decision to grant the City of Norfolk ("City") a permit to remove the nests of eagles residing at the Norfolk Botanical Garden ("NBG") and to perform continued "harassment" activities to prevent re-

1

nesting.   Principally, Plaintiffs seek to set aside the current permit, a permanent injunction against the issuance of future permits, and a declaratory judgment that FWS and USDA Defendants have violated the Bald and Golden Eagle Protection Act ("Eagle Protection Act"), 16 U.S.C. §§ 668 et seq., the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 et seq., the National Historic Preservation Act ("NHPA"), 16 U.S.C. §§ 470, et seq., and the Administrative Procedure Act ("APA"), 5 U.S.C. § 706.  See 2d Am. Compl., Doc. 32 at 21–22.

A.    **Factual Background**[1]

Plaintiff Eagle On Alliance ("EOA") is a group of over 830 individuals from around the world who enjoy observing, studying, and photographing eagles, including those residing in NBG.  Id. at ¶ 8.  Plaintiff Senechal is a resident of Norfolk who founded EOA after spending many years watching, photographing, and enjoying the NBG eagles.  Id. at ¶ 9.

A complete list of defendants and their practical connection with this litigation is important for the sake of clarity. Sally Jewell, the Secretary of the Department of the Interior, is the head of FWS' parent agency. Dan Ashe and Valerie Slocumb are high-level employees of FWS, the agency responsible for issuing eagle "take" permits. Tom Vilsack, the Secretary of the United States Department of Agriculture ("USDA"), is the leader of the governmental agency which oversees the Animal Plant and Health Inspection Services ("APHIS"). Kevin Shea is the Administrator of APHIS, the agency responsible for Wildlife Services, the agency which carried out the removal and harassment of eagles at NBG.  Finally, NAA, the operator of Norfolk International Airport ("NIA"), is a geographic neighbor of NBG.  Id. at ¶¶ 10–15.

---

[1] "In considering a motion to dismiss, [the Court] accept[s] as true all well-pleaded allegations and view[s] the complaint in the light most favorable to the plaintiff." Venkatraman v. REI Sys., Inc., 417 F.3d 418, 420 (4th Cir. 2005) (citing Mylan Labs., Inc. v. Matkari, 7 F.3d 1130, 1134 (4th Cir.1993)).  The Court cautions, however, that the facts alleged by Plaintiff are recited here for the limited purpose of deciding the instant motions.  The recited facts are not factual findings upon which the parties may rely for any other issue in this proceeding.

The present dilemma began in 1938, when NBG and NIA were built adjacent to one another. Id. at ¶ 38. Both properties are also adjacent to Lake Whitehurst, which provides a steady source of food for birds in the region. Id. Since 2003, a pair of eagles ("NBG Eagles") has nested, lived in, and raised their young in NBG. Id. at ¶ 37. The NBG Eagles are also the only publically viewable mated pair that resides in the Norfolk area. Id. at ¶ 41. In 2006, NBG's administrators installed an "Eagle Cam" so that people around the world could view the NBG Eagles' activities via the Internet. Id. at ¶ 37.

Problems arose quickly however, as airplanes and eagles make poor neighbors. Since 2002, there have been at least four collisions between eagles and airplanes at NIA—with two of the collisions involving eagles nested at NBG. Doc. 63 at Pls.' Supp. Ex. 1. Most notably, on April 26, 2011, the female NBG Eagle was killed by an airplane as she enjoyed a fish on one of NIA's runways.[2] 2d Am. Compl. at ¶ 40.

In reaction, authorities at NIA contacted appropriate state and federal agencies, including those represented by some of the Defendants, and met with them to address the on-going safety risk (both to the "flying public" as well as the local eagle population) believed to be caused by eagles nesting close to NIA. Doc. 24 at 5. The incident also prompted the USDA's Division of Wildlife Services ("WS") to publish a Wildlife Hazard Assessment for August 2010- July 2011, which characterized the potential for recurring "eagle strikes" at NIA as posing an "extremely high" risk to aviation. Doc. 24 at 4−5. In addition, WS recommended that the eagles' nests at NBG be removed as a "hazard mitigation measure." Id. at 5. Further investigations were then

---

[2] The male eagle has since re-mated and continues to nest in NBG with his new mate. Doc. 14, ¶¶ 35–36.

conducted by various state and federal agencies, and several publicly and privately employed experts were consulted regarding the risks involved.[3]  Doc. 24 at 16–17.

FWS issued permits to City in September of 2012 to remove eagle nests at NBG. Under these initial permits, City employed the help of WS to remove as many as seven nests. 2d Am. Compl. at ¶¶ 42–44. In November 2013, FWS issued City a new permit that does not expire until October 31, 2014. Id. at ¶ 37. The substance of this new permit grants City the right to remove eagle nests and to disturb the NBG eagles through "harassment" techniques in order to alleviate the "safety emergency" at NIA. Id. at ¶ 5. Under this currently active permit, City has removed an eighth nest, id. at ¶ 45, and, with the assistance of WS, has maintained a level of harassment to prevent the NBG Eagles from re-nesting. Doc. 24-1 at ¶¶ 15–21.

**B.    Procedural History**

On July 3, 2013, Plaintiffs filed a Complaint against Defendants Sally Jewell, Dan Ashe, and Wendi Weber. Doc. 1. On October 2, 2013, the three original Defendants filed their Answer. Doc. 10. On October 3, 2013, Plaintiffs filed an Amended Complaint, clarifying their prior claims and adding Tom Vilsack and Kevin Shea as defendants. Doc. 12. On October 21, 2013, Defendants filed their Answer to the Amended Complaint. Doc. 14.

On October 25, 2013, Plaintiffs filed a Motion for a Temporary Restraining Order, Doc. 15, and/or a Preliminary Injunction, Doc. 18, and filed Amended Memoranda in Support, Docs. 22–23, on October 28, 2013. The Court held a hearing on October 29, 2013, and ruled from the bench finding that Plaintiffs failed to meet their burden for injunctive relief. Doc. 25. The Court issued its opinion and order explaining its reasons for denying Plaintiff preliminary relief on November 22, 2013. Doc. 26.

---

[3] NIA authorities consulted Sarah Nystrom, FWS' Regional Bald and Golden Eagle Coordinator; an eagle biologist from the Center for Conservation at the College of William and Mary; and Dr. Scott C. Barras, a USDA employee who also serves WS (as a Supervisory Wildlife Biologist); and the State Director for Virginia. See Doc. 24.

On December 19, 2013, Plaintiff filed a Motion to Amend their Amended Complaint to Challenge the November 2013 permit issued by FWS and to add NAA as a defendant.[4]  Doc. 27. The Court granted this motion on January 14, 2014.  Doc. 31.

On February 6, 2014, NAA filed a Motion to Dismiss the Second Amended Complaint. Doc. 35.   On February 16, the USDA Defendants filed an Answer to Second Amended Complaint, Doc. 39, followed by a Motion to Dismiss on February 20.  Doc. 41.  On February 21, Plaintiffs filed their Opposition to NAA's Motion to Dismiss.  Doc. 41.  On February 27, NAA filed its Reply, but then filed a Motion to Correct its Reply on March 3, 2014.  Doc. 47. The Court granted this Motion on March 4, Doc. 49, and NAA submitted its Corrected Reply that same day.  Doc. 50.  On March 6, Plaintiffs filed their Opposition to the USDA Defendants' Motion to Dismiss.  Doc. 51.  On March 13, the USDA Defendants filed their Reply to Plaintiffs' Response in Opposition to the Motion to Dismiss for Lack of Standing.  Doc. 53.

## II.    STANDARD OF REVIEW

The elements of federal jurisdiction are not "mere pleading requirements but rather an indispensable part of plaintiff's case." Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992); see also Piney Run Pres. Ass'n v. Cnty. Comm'rs of Carroll Cnty., MD, 268 F.3d 255, 263 (4th Cir. 2001).  Accordingly, "each element must be supported . . . with the manner and degree of evidence required at the successive stages of the litigation."  Lujan, 504 U.S. at 561.  Therefore, to establish proper jurisdiction on a motion to dismiss, a plaintiff "need only plausibly allege" the necessary supporting facts.  Liberty Univ. v. Lew, 733 F.3d 72, 90 (4th Cir. 2013).

Federal district courts are courts of limited subject matter jurisdiction.  United States ex rel. Vuyyuru v. Jadhav, 555 F.3d 337, 347 (4th Cir. 2009) (citing Exxon Mobile Corp. v. Allapattah Servs., Inc., 545 U.S. 546, 552 (2005)).  Accordingly, this Court must determine first

---

[4] Original Defendant Wendi Weber was not included in Plaintiffs' Second Amended Complaint.

whether it has jurisdiction over the claims at issue. See Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94–95 (1998) (quoting Manfield, C. & L.M.R. Co. v. Swan, 111 U.S. 379, 382 (1884)) ("The requirement that jurisdiction be established as a threshold matter 'spring[s] from the nature and limits of the judicial power of the United States' and is 'inflexible and without exception.'"). "The objection that a federal court lacks subject-matter jurisdiction . . . may be raised by a party, or by a court on its own initiative, at any stage in the litigation . . . ." Arbaugh v. Y & H Corp., 546 U.S. 500 (2006) (citing Fed. R. Civ. P. 12(b)(1)).

The United States Constitution restricts federal courts to deciding only actual cases and controversies. U.S. Const. art. III, § 2. Among "[t]he several doctrines that have grown up to elaborate that requirement," the one "that requires a litigant to have 'standing' to invoke the power of a federal court is perhaps the most important." Allen v. Wright, 468 U.S. 737, 750 (1984). The basic purpose of the standing doctrine is to ensure that the plaintiff has a sufficient personal stake in the outcome of a dispute to render judicial resolution of it appropriate in a society that takes seriously both "the idea of separation of powers" and, more fundamentally, the system of democratic self-government that such separation serves. Id. at 750–52. The doctrine encompasses both prudential, "judicially self-imposed limits on the exercise of federal jurisdiction," and "a core component derived directly from the Constitution." Id. at 751; see also Lujan, 504 U.S. at 560; Friends for Ferrell Parkway, LLC v. Stasko, 282 F.3d 315, 319–20 (4th Cir. 2002).

"On a motion to dismiss pursuant to Rule 12(b)(1), the party asserting jurisdiction has the burden of proving subject matter jurisdiction." Balzer & Assoc., Inc. v. Union Bank & Trust, 3:09cv273, 2009 WL 1675707, at *2 (E.D. Va. June 15, 2009) (citing Richmond, Fredericksburg & Potomac R.R. v. United States, 945 F.2d 764, 768 (4th Cir. 1991)). That party must establish

three elements to satisfy the constitutional requirements for standing. "First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." Lujan, 504 U.S. at 560 (internal quotation marks and citations omitted). Second, the plaintiff must show that the injury is "'fairly ... trace[able] to the challenged action of the defendant." Id. (quoting Simon v. Eastern Ky. Welfare Rights Organization, 426 U.S. 26, 41–42 (1976)). Third, "it must be likely . . . that the injury will be redressed by a favorable decision." Lujan, 504 U.S. at 556 (internal quotation marks and citation omitted).

"An injury sufficient to meet the . . . elements of the standing inquiry must result from the actions of the [defendant], not from the actions of a third party." Mirant Potomac River, LLC v. EPA, 577 F.3d 223, 226 (4th Cir. 2009); see also Frank Krasner Enters. Ltd. v. Montgomery Cnty., 401 F.3d 230, 234–35 (4th Cir. 2005). Additionally, there is no redressability when, even if the plaintiff were to prevail, a party not before the court would still be free to engage in the offending action. See, e.g., Levine v. Vilsack, 587 F.3d 986, 991–95 (9th Cir. 2009) (holding that plaintiffs lack standing where redressability depends on third parties altering their behavior); Klamath Water Users Ass'n v. FERC, 534 F.3d 735, 739–41 (D.C. Cir. 2008) (finding no redressability where petitioner's relief relied on actions by third parties not before the court and petitioner failed to show that a favorable decision would significantly increase the likelihood of relief).

## III.   DISCUSSION

### A.   USDA Defendants' Motion to Dismiss

The USDA Defendants argue that Plaintiffs' claims against Secretary Vilsack and Administrator Shea should be dismissed for lack of standing under Rule 12(b)(1). In support,

they note that USDA, APHIS, and WS did not issue or receive the permit in question. Doc. 36 at 1–2. Furthermore, they claim that Paragraph N of the permit authorizes City to utilize third party services other than WS to conduct the challenged actions.[5]   Doc. 42 at 7.   Accordingly, the USDA Defendants assert that since City could easily contract with an entity other than WS, Plaintiffs cannot show that their alleged injuries, the diminution of aesthetic, photographic, and recreational interests, are likely to be redressed by a favorable judgment. Doc. 42 at 8.

Plaintiffs' Response refers to Paragraph B of the November 2013 permit which states that the permit's "validity is also conditioned upon strict observance of all applicable foreign, state, local, tribal or other federal law." Doc. 51 at 7.  Plaintiff's argument is that, assuming WS violated federal law as alleged in the Second Amended Complaint, Paragraph B requires that the permit be invalidated and that this invalidation is sufficient to satisfy the redressability requirement for the purposes of standing.

The Court finds Plaintiffs' argument most persuasive at this stage of the litigation.  The USDA Defendants' argument based on Paragraph N is only viable if the permit remains valid.  If the permit is invalidated, then the right to delegate duties under that permit is irrelevant. Plaintiffs' Second Amended Complaint requests that this Court declare the "federal Defendants," a group that includes the USDA Defendants, in violation of four federal laws.[6]   2d Am. Compl. at 21.   According to Paragraph B, the validity of the permit is "conditioned upon strict observance of all applicable . . . federal law." Doc. 51 at ex. 6 (emphasis added).  Additionally, Paragraph O clearly states that City is "responsible for ensuring that [its subpermittees] adhere to

---

[5] The City acknowledged that third parties could exercise authority under the permit in a November 19, 2013 letter delegating authority to WS to act under the permit. The November 19, 2013 letter further certifies that WS advised City of the possibility that there are private sector service providers available to provide the wildlife management services that the City sought from WS.  Doc 62, ex. 2.

[6] In Plaintiffs' prayer for relief (2d Am. Compl., at ¶73(1)) declaratory judgment is sought against "federal defendants" on all four laws mentioned above; however, Claim I (Id. at ¶¶ 67–71) only alleges violation of the Eagle Protection Act by FWS. This discrepancy is unimportant at this time.

the terms of" the permit. Id. Therefore, if the Court finds the USDA Defendants in violation of any of these laws, City, the permit holder, would be responsible under Paragraph O for that violation, and Paragraph B would operate automatically to invalidate the permit.

The cases relied on by the USDA Defendants are clearly distinguishable from those facts currently at hand. For example, in Goat Ranchers of Or. v. Williams, 379 Fd. App'x 662 (9th Cir. 2010), the Ninth Circuit found no redressability because the state government was free to continue taking cougars even if the federal agency was barred from doing so. Here, the opposite is true. If the permit is invalidated, than neither WS nor City will be allowed to continue taking eagles without the issuance of a new permit. Similar logic, if not identical, was employed in deciding the other cases cited on this point by the USDA Defendants. See Fund for Animals v. Babbitt, 2 F. Supp. 2d 570, 575 (D. Vt. 1997) (finding no redressability where "the state is authorized to continue, and will continue, to conduct the moose hunt"); Americanus v. Wildlife Services, No. CV-03-1606-HU, 2004 WL 2127182, at *5–6 (D. Ore. Sept. 23, 2004) (finding no redressability because Oregon law allows landowners to kill depredating bears at will).

Neither the obvious importance of preventing eagle strikes at NIA, nor the seemingly high likelihood that City would be able to obtain a new permit in the future, is relevant to the current discussion. See Defenders of Wildlife v. N. Carolina Dep't of Transp., No. 13-2215, 2014 WL 3844086, at *1 (4th Cir. Aug. 6, 2014) ("we do not decide whether we agree with Defendants' policy choices or project preferences [but instead] must determine whether Defendants have complied with the law in reaching their decisions"). Plaintiffs' claim to be able to invalidate the current permit is a sufficiently plausible allegation to establish redressability and thereby satisfy Plaintiffs' standing as to the USDA Defendants at this early stage of the litigation. See Lujan, 504 U.S. at 561. Therefore, the USDA Defendants' Motion to Dismiss is **DENIED**.

**B.    NAA's Motion to Dismiss the Second Amended Complaint**

As a threshold matter, this Court must first address NAA's assertion that Plaintiffs do not have sufficient Article III standing for this Court to have jurisdiction over NAA in this matter. NAA claims, and this Court agrees, that Plaintiffs' allegations fail here because they do not show plausible facts sufficient to support a finding that it is likely Plaintiffs' "injury will be redressed by a favorable decision." Id. at 556.

The only claim for relief brought against NAA seeks an injunction preventing NAA from "engaging in, implementing, or funding any of the activities authorized by the permit." 2d Am. Compl. at 22.  The parties appear to agree that, factually speaking, this claim applies only to financial support NAA has provided to City towards the execution of the permit. See id. at ¶ 15; Doc. 50 at 1.  Accordingly, the only question this Court must address on this issue is whether enjoining NAA from providing financial assistance to City is likely to redress Plaintiffs' injury. See Lujan, 504 U.S. at 556.

In defending this exact issue, Plaintiffs puts forth three allegations.  First, that NAA "is funding the activities they seek to end." Doc. 43 at 6.  Second, that Plaintiffs seek an order prohibiting NAA "from continuing to fund such activities." Id.  Third and finally, that "the permit *requires* the City to work with NAA to conduct harassment activities." Id.

The first two facts listed above do not establish any likelihood that a judgment against NAA would redress Plaintiffs' injury.  The mere assertion that NAA contributes financially to the execution of the permit does not plausibly make it likely that were that funding enjoined, City would cease removal activities under the permit.  This Court finds it just as likely, perhaps even far more so, that City would simply find funding to perform the permitted removal activities from another source due to the significant pressure to act from state and federal agencies.  See

Doc. 63 at Pls.' Supp. Ex. 1. Plaintiff has pointed to very little in the administrative record to indicate that City was completely reliant on NAA funding.[7] Therefore, the Court **FINDS** that Plaintiffs have not met their burden to show a plausible likelihood of redressability.

Additionally, the second element of standing is also in doubt here. This element requires a plaintiff to demonstrate that its injuries are fairly traceable to the challenged conduct of the defendants. Lujan, 504 U.S. at 560. The "fairly traceable" standard is "not equivalent to a requirement of tort causation." Natural Res. Def. Council, Inc. v. Watkins, 954 F.2d 974, 980 n.7 (4th Cir. 1992) (quoting Pub. Interest Research Group, Inc. v. Powell Duffryn Terminals Inc., 913 F.2d 64, 72 (3d Cir.1990)); see also Vermont Agency of Natural Res. v. United States ex rel. Stevens, 529 U.S. 765, 771 (2000) (holding that even harms flowing indirectly from the action in question can be said to be "fairly traceable" for standing purposes). Even considering this broad standard however, it is questionable whether NAA funding the eagle dispersal activities is sufficient to meet the fairly traceable test for the same reasons undermining redressability, namely that it is likely the dispersal activities would continue without NAA funding.

Alternatively, Plaintiffs argue that regardless of the Court's decision on Article III standing, NAA's motion should not be granted because NAA is a necessary party. Doc. 43 at 6. In the same breath however, Plaintiffs admit that this argument is not persuasive. Id. at 5 ("Plaintiffs do not believe that [NAA] is necessary to obtain effective relief in this case"). The Court agrees, and finds that Plaintiffs have failed to show sufficient facts to satisfy any of the requirements of Federal Rule of Civil Procedure 19. NAA is not a necessary party to this case.

---

[7] The only evidence presented from the administrative record of City's refusal to proceed without NAA funding is found in an email exchange between Becky Gwynn of VA Dept. of Game and Inland Fisheries and Sherry Morgan of FWS. Doc. 63 at Pls.' Supp. Ex. 19. Ms. Gwynn indicates that she spoke with an Assistant City Manager and that "[s]he did not seem particularly appreciative of our advanced notice; her primary question had to do with who was going to pay for the proposed work." The Court does not find this singular reference to be persuasive that City was unlikely to proceed with the recommended eagle removal activities.

Accordingly, this Court **GRANTS** NAA's Motion to Dismiss **WITH PREJUDICE** due to a lack of Article III standing.  NAA also sought to dismiss Plaintiffs' Second Amended Complaint on the grounds that Plaintiffs failed to state a claim upon which relief can be granted and for failure to join City as a necessary party.  However, having dismissed NAA from this case on jurisdictional grounds, it is neither necessary nor appropriate for this Court to opine on the merits of NAA's other proposed bases for dismissal.

## IV.     CONCLUSION

For the reasons stated above, the Court **DENIES** the USDA Defendants' Motion to Dismiss and **GRANTS** NAA's Motion to Dismiss the Second Amended Complaint **WITH PREJUDICE**.

The Clerk is **REQUESTED** to send a copy of this Order to all counsel of record.

It is so **ORDERED**

/s/
Henry Coke Morgan, Jr.
Senior United States District Judge
*HENRY COKE MORGAN, JR.*
SENIOR UNITED STATES DISTRICT JUDGE

Norfolk, Virginia
Date: September ___, 2014